This case is all about good faith. I disagree with the prosecution in their opposition on page 41. It's in their footnote 21. They're saying that even if the court reverses Sweet's conviction on other counts, Sweet has not challenged his conviction for sale or receipt of stolen property. Accordingly, that conviction stands. In our opening brief at page 60, we specifically say a retrial is being sought as to all the mail fraud counts, the money laundering, and the receipt of stolen property. And the reason why the stolen property wasn't dwelled on is because it's basically the stolen property would have come from the mail fraud, the act of mail fraud. And so if the mail – if the good faith – if the good faith defense is – picks that out of the way, then it's not stolen property. And so that's why he wouldn't receive the stolen property. Why is that? Why isn't – as I understand it, he got a bunch of money from these people, which he said was going to be escrowed and used for their investment. And he then took a chunk of it – not the chunk that went to Ghilarducci – and put it in his own bank account and used it. Why isn't that stolen property? First of all, we have to look to the indictment, Your Honor. That's what gave the defendants the notice of what they're facing. Now, in – Excuse me, counsel. This added to that. In addition to taking the property, lying to investors about a nonexistent scheme that would yield 25 percent returns. Why is that good faith? The statements themselves were not arguing that he made them. But we've submitted a substantial amount of evidence that those statements were provided to him from third parties. There were two transactions. The first one was with Kathy Steffen. And she set that up, and that's where the $205,000 went into the escrow. And she sent Mr. Sweet documents saying that your money has earned – has earned a certain amount of money. And what he was saying was he received that money, he paid Mr. Sherwood some money, he paid the people that were helping him money. He was under the impression that there was going to be a payout from that first transaction with Mr. Davis, Mr. Lau, and Ms. Sherwood. Those were the three people that contributed money – excuse me, there was one other person whose money was returned to. But didn't he use money for his own personal expenses? Yes, ma'am, he did. But where that came from, though, was his perception that there would be – that the money would come back from the transaction when he received the payout. That was his position. But was a jury required to believe him? In other words, you put in evidence that he dealt in good faith, no question about it. But does a jury – did a jury have to buy his position? The jury had before them all the other facts of his receiving this money from friends and relatives, and also that he promised them he was going to get 25 percent every eight weeks. Couldn't a jury reasonably conclude, beyond a reasonable doubt, that he engaged in a fraud to obtain this money? The – all of the events that occurred from – all of the events that occurred from the beginning where there are the three – Mr. Sweet is not a financial wizard, and his background is music, and he did sell insurance. But there were three other people that he began to rely on in the beginning. Mr. Holt, Mr. Meyer, and I'm sorry, Your Honor, I forget the third one. But one was a banker. One was – had a tremendous amount of experience that he used traveling around. And so from that, that's where this – the development of the program came from, was these four men together. Now, we understand that. You see, and that's good for – you're at the appellate level now, unfortunately, for Mr. Sweet. At the – at the trial level, you gave a good presentation that he believed that this was going to be a half a payout. But the jury didn't buy his position. They bought the position that he never thought that this was going – that this was a fraud, pure and simple, and that it was a – the whole thing was unbelievable that he promised these people 25 percent return on their investment every eight weeks. And the jury concluded that his position that he thought this was going to be a payout at the end for everyone and he was just putting the ducks on the pond, getting everything laid up, was a cock and bull story. May I disagree with that, Your Honor, because he did – he was found not guilty of the first transaction. He – and that was the one where he spent the money from. Well, but he was found guilty of the other transactions. This is where the jury instruction comes into play and why it's so critical. There's three errors with the jury. I don't understand the – I mean, you're saying there's no good faith during instruction, but in fact there's a page and a half long good faith during instruction. So what's wrong with it? What's wrong with it, Your Honor, is at the end of it that was tagged on by the government where they have the gullibility portion of it. We never, never said that the – that the individuals who invested in it were gullible or that that should – that was never – that was a part of that case that that instruction was taken out. That was almost a pinpoint instruction for that defendant. That really is not – it wasn't a part of it. And then it was misread. It was read erroneously. Is that what you're having us turn on? Yes, Your Honor, it was. But you didn't even object to trial. It was so innocuous that even at trial it was not foreseen. Well, I think – And why should we at this level under plain error say, well, the jury latched on that and were confused? Well, we know that the 12 jurors read that or were present. We know that the 12 – So who did the lawyers before it was charged? That's true, Your Honor. No one said, boo. Well, we know that the government created the instruction, and they didn't say anything either when it was misread. We had to bring to – But what was it the jurors read? Both – my understanding is that the argument to the jury by the prosecution stated it correctly and that the jury had a written version which was correct. Well, I believe the rule of law is that the arguments of the party is not the law. I understand. Just in terms of whether anybody was really confused, however. Well, we don't know if they were confused or not. We do know that he was found not guilty of the first offense, first transaction, and that bled over into the second transaction, and that's what the problem is. And it also shifts the burden, Your Honor. When you read – that almost goes to the body of good faith. If one word was incorrect, but don't we have to look at the entire jury in its entirety and see whether or not there was an error? And looking at the entire jury instruction where the instructions were pretty broad as to this defense which you had, could we say at the appellate level that, yes, this jury was misled as to what their duty was in evaluating the facts? We would ask you to do that. And the reason why is because – and that's why we were referring to Southwell. We know that this is not an insanity defense that Mr. Sweet's raising, but what we are arguing and what we're asking the Court to do at this case is the fact that we don't know whether they were confused. That was read to them, and it said the defendant – it's not a defense that the defendant is gullible or negligent. And that's what the – That sentence would have been inconsistent with that as well. Excuse me? The next sentence basically is – all right. Aside from that error, aside from that reading error, what else is wrong with the instruction? Okay. The – when we began, we were focusing on the conspiracy, and we asked for the unanimity instruction in that. And that's true. The foundation of the conspiracy, if you look at the indictment, is the mail fraud. And our whole case was based on the fact that the acts themselves, the mail fraud, was – he did not specifically intend to defraud those people at the time that he – that the transaction – certainly the investment is outrageous. One of the things – I mean, in some ways, I'm sure – I think that Judge Cowan may have given you, you know, a better state of the law than actually exists because he, in fact, was lying to those people in those letters. They were saying things that weren't true. So if that's the case, why does it matter whether he thought in his mind that everything was going to come out okay in the end? The fact is that these people had entrusted money to him on certain representations, and he was continuing to make false representations, even if he thought that in the end they were going to make money. No, no, no. At the time he made the representations, Your Honor, he believed them to be true. That's – he never – What about this Christmas letter? He believed the things that he said in that Christmas letter? Yes, ma'am. He did. He believed that. It's outrageous, but he did. And the things – he is a very religious man, too. That was brought up about all the kings, all wise men, whatever the quote was. I'm not exactly sure. But Mr. Sweet is a very religious man. We put on evidence for him. But did the jury have to believe that he had good intent when they had before them what he said in the Christmas and the New Year's letter as well? Yes, Your Honor. And these things were exactly contrary to many of the things that he was actually doing. He was pocketing a lot of the money he was getting himself. He had no escrow account. He had nothing substantial in the works at the time he promised these people. But remember, in his mind, when he's using that money – he was a salesman. He received commissions in his prior business. And in his mind, he's thinking that it's okay for him to do that. Now, when you look back retrospectively, he found that to be not the best thing to have done. That's what he said. I have another question, if I might. I think your time is about up, but I want to ask this question. We'll give you enough time. Don't get too anxious, okay? So don't get too anxious. We'll have enough time. After there were no funds in the Costa Rica bank account and after learning that Newman was not an employee, when did your client contact Newman and Giarduzzi, if I said that correctly, about this problem? He contacted him after that, if I believe. I'm trying to understand whether there is a non-suspect explanation for some of his actions, and an answer to that question would be very helpful. It's a short period of time, or within a year and a half, that this all occurs. And he's sending letters back and forth with Giarduzzi. His documents are seized by the police, I believe, in May. And so he's trying to put that together. And that's when he writes that letter in August. Finally, it's hard to explain unless you've met Mr. Sweet. We, of course, are not going to meet him. We have to look at the record. Yes. But if you look at the record, and to answer your question, too, about the money and the spending, it seems unbelievable if you look at what's going on. But if you look at what the jury found, that's why it's ‑‑ because they put on evidence that he received the money, and then he didn't put it in the bank. He absolutely did not follow what he was supposed to do. It's true. But the jury found that he wasn't guilty of that. The verdict does not have to be completely reconcilable. The law is clear that he could be ‑‑ they could cut him loose on some things and still find him guilty on others. They do not have to be compatible. But the state of the evidence, Your Honor, that second transaction, he doesn't find out that that's not ‑‑ He still believes it all the way up into this last part, into May, when they're calling him on the phone. He's still believing. It seems impossible, but he does believe this. He believes it. I think we understand your answer. Okay. Thank you very much for your argument. May I reserve a minute to ‑‑ We'll see. Thank you very much. Mr. Page. Yes. Good morning, Your Honor. I'm Terry Grandel on behalf of Longus Gilarducci. Having been the trial counsel, I want to address the issue of the tape. The tape was the most important thing that the defense wanted to offer up at the trial. We believe it was a relevant piece of evidence that would show Mr. Gilarducci's good faith efforts to educate, warn, advise potential investors of the dangers, the risks, and the obligations of the investors before undertaking these confirmation of fund transactions. Okay. That's good. Let me ask you. Weren't Sweet and the FBI agent, Climax? What was the guy's name? Climax. Climax. In far different circumstances when they first called Gilarducci. Well ‑‑ Sweet had already talked to Las Maze. Las Maze. Several times and even completed an application. And this call was out of the blue. And that was a debate before the trial court was whether it was a cold call, as the government called it. But there was a referral source even in Agent Climax's call, which was Ron Allen, which was a prior purchaser of confirmation of funds. So we don't necessarily say it's not. And he was paid a $75,000 finder fee. And so the thing is, though, and the court mentioned that, that how do we know that this was similar to what Sweet was involved in? Sweet could have taken the stand again and said it wasn't. And we don't know if it is or not. I think that should have gone to weight and not to disability. But my bigger issue was that the government had introduced Exhibit 40-0, which was the chart, which was a large chart dealing with the 23 prior confirmation of funds failings. So I've got to deal with how do I explain these 23 prior failings. And that's why this evidence would have rebutted that. I don't understand quite how it helps you. And maybe because I don't understand the transactions. But as I understand it, quite aside from what he was telling him in this telephone call was, you're going to give me a bunch of money, and I'm going to give you a letter back saying there's a bunch of money set aside for you. But I'm not responsible for what you do with that money, essentially is what he was saying. You have to go find the investments to use that money on. Was that essentially what he was saying? It's something like that, where he says that you have to find a source. Right. And they talk about finding a source. I'm just going to give you the vehicle. You still have to make the end meet. But nonetheless, he was still proposing to take a whole lot of money to write a letter saying there was a bunch of money in a bank that wasn't there. That's true. So how does this help him? Well, there were 23 prior failings. Every time the government mentioned anything dealing with Mr. Ghilarducci, they said he's a con man, he's a swindler. It helps me because he doesn't do anything to this cold call to this person coming in saying, except get more information. You're not ready yet to give me a million dollars. He agrees he's going to take the money and issue a letter for money that isn't there. He simply says what you're going to do with that money that isn't there or purport to do isn't my problem. But as for the question of the money that isn't there, it doesn't help him at all. He doesn't take the money. He says, listen, I will take your money. In this case, it's a million dollars. I'm happy to take your money. And I'll say there's $30 million even if there isn't. So why is that? How does that help him? It helps him because he doesn't take the money. He says you need more information. You need more education. This shouldn't be money that you need for food on your table. It helps him because he doesn't take the money. He doesn't say, listen, send the check right now. I'm ready for it. I agree with you that it shows, which it would have some. But how do you get around the old legal nut that the fact that I commit burglary five times and that I turn down doing it a sixth time is proof of anything? In other words, you can commit any number of crimes. You're not going to show you didn't commit the other crimes by showing I didn't commit a similar crime on the sixth occasion. Right. It's not direct evidence. But it is circumstantial evidence. No evidence. It's just that, it's just that I committed, there's proof that I committed five crimes and on the sixth occasion I don't commit the crime. I don't want to commit burglary. That's what the government says. That the proof of a non-crime doesn't mean that he didn't do it on these other occasions. But it could have been evidence as to that. And it should have gone to weight rather than admissibility. The jury should have seen that for these prior 23 failings, there may have been another 23 or 46 or whatever that he didn't do, that he did several things he didn't want to do. Are you going to discuss the sufficiency of the evidence question with regard to the mail fraud? Well, that's an issue. Based on the question as to suite. How does he get convicted of mail fraud, which is criminally derived property, yet not get convicted on the receiving stolen property? Well, let's wash that out because we know that that's not a problem. But quite aside from that, how does he get convicted? What I'm trying to figure out is how does he, as I understand the conviction on the mail fraud, and maybe I'm not having the right mail frauds, but he's being found guilty of the fraud are the letters that Mr. Sweet sent. Is that right? He got convicted of the two Christmas letters. Right. Two New Year's Eve letters. All right. And with regard to the Christmas letters, there is a reference there that in the letter, I have informed today that the funds authentication letter has been received by the attorney for the Bank of London. Is there any evidence that he was so informed by Mr. Garland that Mr. Garland should know anything about this letter? I don't know. There's no evidence that he supported, he condoned it, he authorized it, he helped with it. He knew about it? No evidence that he even knew about that Sweet was sending these letters out. I've got the expert testimony that in this type of fraud that it's, it's, it's, it can readily be likely and assumed that, that, that investors will be brought in through the use of the mails and that Sweet actually told him that it wasn't his money. Although the application said it's got to be your money, Sweet actually admitted on a cross-examination by the government that it was. I'm not sure if that's true. That was a conflicting testimony. It seemed clear to me on my cross-examination that Sweet did not tell Gilarducci that this was money that was from a pool of investors. He seemed to make it clear that it was his money. Well, they could have inferred from that testimony that, that it was not Sweet's money, that he was getting it from other sources. And then how about the expert testimony that with this type of, of, of fraud that, that Gilarducci had to know that there were others and that you would normally and naturally just use the mail to solicit funds or to. Then why wasn't he convicted of the three other letters? That, that, that is not, no one will ever know. And the law clearly says you can be charged with three things, convicted on two, the evidence is the same of all three, and it's not a violation of due process. I think it's more evidence of the insufficiency of the evidence that, that not only do you have an inconsistent verdict, but you also have insufficiency. How about the, the thesis of the expert test, of the expert's testimony that given these fraud, that Gilarducci knows that there are layers and that it's just natural and likely that the, that the phone or the mails are going to be used. Unfair inference to have made, because I don't think the expert said that and the jury may have inferred it, but I think that's an incorrect inference. I, what I read, that, that's exactly what is his, that was the, the grovelment of, of the expert testimony. Maybe the layers, I don't remember him saying that the mail fraud, that Gilarducci should have assumed that that's what Sweet was doing and that Sweet was sending out long letters. I, I don't think that that's the, the way the state of the evidence showed up. And I don't, and I think that's why he wasn't convicted of some of these letters. It was the reference that Her Honor Berzon made that deals with the, some reference in that Christmas letter to this new investment. And the question is whether they could have inferred from Ned's statement that, that in fact Gilarducci did know about this letter. And that's the only thing that I can think of. But. And, and also the, also the jury can use evidence of things which occurred later on, after the letters were sent and the, the mails were used. They can infer from things that occurred later on what occurred previously. Or they can infer from it reasonably, it's circumstantial evidence, it's not direct. But they can use later occurring events, namely that this whole thing is, is just a lot of nonsense. That there's a fraud, he knew other people's funds were being used and it would not be unlikely. I think the mail fraud statute says unlikely or that, that the mails would be used. I disagree because under that logic then he should have been found guilty of the mail frauds of the two New Year's letters and then the March letter. So that doesn't make sense. I agree with you on that. So that doesn't seem to fly. Also one. I'm sorry. Yes. I'll give you 30 more seconds. Thank you. I just wanted to deal also with, I mean, obviously there were, we gave the Court several vehicles to transfer the case back to Illinois. I'll submit it on that. Except I did want to. Aside from inconvenience, and it was inconvenient, what, how did that hobble you in any way? I'm just going to submit it on that one. What was interesting, though, is once he's convicted in Illinois and they introduce evidence in Illinois of this sweet transaction, then I do a double jeopardy motion to dismiss for duplicate of prosecution, and I think that's a better argument. But aren't there different elements of each of the offenses? Are these offenses compatible? I mean, there are different elements of the two offenses. They're the same thing. They're wire fraud. They wired money. Sweet wired the $450,000. The government just artfully made one a mail fraud and one a wire fraud to try to get around that. So I disagree with that, the RICO versus conspiracy. It all seems like the same parcel. And the main thing was they introduced evidence in the Illinois transaction of the sweet transaction. Yeah, but it's not the evidence tested. It's whether or not the two offenses have different elements. Yes, the way they were pled, they were, but they were the same document. I mean, they were the same information, same facts. Ghilardi, she never said anything by the mail. Everything was done by wire. Thank you very much. Thank you for your argument. Mr. Wright. May it please the Court. Bob Wright for the United States and my partner at trial and on the brief, Sheila Alberto, has been with me at the council table. Good morning. I wanted to start with what I think was the longest discussion between your honors and counsel for Mr. Ghilardiucci a few minutes ago with respect to sufficiency of the evidence. With every confidence that your honors will instantly direct me to other subjects if there are ones what you want to discuss with me. There are several points that stand out. A total of $635,000 was taken in by Mr. Sweet. $450,000 of that he wired to Mr. Ghilardiucci. As a matter of interest, how much is usually paid for COF letters, if anything? Nothing. I know in my bank, I get a statement every month for it just comes. So it's an unusual amount to pay for a COF letter. I recall telling the jury and we're going to go back to the jury. Well, did he thought, I mean, this is so mysterious to figure out, did he think he was paying it for a letter or he was paying it to actually have somebody lend him the money? I mean, reading the application, it appears that there's sort of a promise that there is going to be $10 million, not just that I'm going to say there's $10 million. As the expert explained, there are some provisions in the agreement that are nonsensical and there are some actually that you could find as a standard contract provision like maybe an indemnity clause in a real contract. But what's key here is for the $450,000, this one-page letter is sent whose only purpose can possibly be to perpetrate a fraud. If Your Honors put yourself in... Well, let's assume all that's true. I mean, he knew there was a scam going on. That isn't the question. The question is what specifically does he have to know about the way in which the I mean, looking back at some of our cases, it seems to me that in every instance in which we've said that a likelihood or an expectation is good enough, it's been because the transaction technically required it. In other words, you have to send a registration into a DMV in order to register a car and you have to send certain documents around to make loans. But although it's certainly true that he obviously expected that some representations were being made and he might have had some reason to think they were untrue representations, he certainly had no specific reason to believe that these specific letters were going to be written, that there were going to be letters as opposed to phone calls, as opposed to face-to-face conversations, what was going to be in them or any of that. I mean, he just didn't know anything about what Mr. Sweet was doing in relationship to his investors. All he knew was that he had some money and it was probably not, and it wasn't his and it was probably not kosher. Well, I'll submit to Your Honor that there is actually an overwhelming circumstantial evidence case from which the jury certainly can draw inferences that Mr. Ghilarducci indeed knew that the money sent to him was criminally derived. He doesn't have to know the specific crime. Okay. And also knew that the letter he was furnishing, the only earthly purpose of it could be to perpetrate a fraud. Okay. But what about the mail fraud? I'm sorry, Your Honor, I just said that. What about the mail fraud with regard to this Christmas letter, for example? Okay. With respect to the Christmas letter, that actually was transmitted by Mr. Ghilarducci to Mr. Sweet, and the cover letter said that letter was being presented to a Mr. Sweet at the so-and-so at Bull and Bull in London. Happly Lane. I'm sorry, where is this in the record? There's something in the record that says that Mr. Ghilarducci sent a copy of this letter to Mr. Sweet? Yes. I'm going to go over to that right now. Mr. Ghilarducci sent it to Sweet. The letter itself is on page 77 of our supplemental excerpts of record. The transmittal letter to Mr. Sweet from Mr. Ghilarducci is the previous page, page 76 of the supplemental excerpts of record. And that is addressed, dated the same date as the confirmation letter, December 5th. It's addressed for Mr. Ghilarducci, signed by him to Mr. Sweet, read delivery of confirmation of funds letter. And it tells him it's been issued, and he says at your request, the hard copy of the letter. Am I incorrect in believing that one of the mail frauds for which Mr. Ghilarducci was found guilty was the December 24th, 1997 letter from Mr. Sweet to his clients? Is that not correct? That's correct. All right. So what you just said is not responsive. I want to know what there is to link Mr. Ghilarducci to that letter. Well, what that letter itself specifically refers to, the funds authentication letter. Well, the funds authentication letter does not, was not, I have been informed today that the funds authentication letter has been received by the attorney for the Bank of London. Do we have any reason to think that Ghilarducci gave him that information or knew that this letter was going to go out or anything like that? Well, I certainly would tell Your Honor that from the circumstantial evidence and the facts in the case, it certainly, there is a cause and effect. Mr. Ghilarducci provides the confirmation of funds letter. It has some purpose, and then it is used in the fraud as part of a lulling letter by Mr. Ghilarducci, his Christmas Eve letter to all of his investors when he refers to the fact. Well, he certainly knew that he was going to use it at some point for something. All right. But how does that, is that sufficient to tie into mail fraud? I mean, he could have sat on it. He didn't know what his deal with his investors were. He didn't know whether he owned them anything now or in six months or in a year, so he didn't know that he was going to do anything now. He also didn't know he was going to do it by mail rather than talking to them. Is there any case law that says that a connection this loose is sufficient? Well, those cases we cited, like the Boland case, the Rood case from this court, the Polichemi case, do talk about these types of schemes, these trading schemes, which are totally fictional and talk about circumstantial evidence, the jury being able to draw inferences from that evidence. The Bonanno case out of this circuit involved concocting phony documents. This COF letter was phony from A to Z. The COF letter, I understand. I want to know how he's connected to the other letters. Didn't your expert connect up the fact that the mail, the 80-unit betting mail fraud by Giller Ducey, that he had to know of the nature of the scheme, the layers of it, that the mails would inevitably be used, likelihood of it being used? Yes. The way this works is somebody like Mr. Sweet comes along. He's been spending money, spending money. All of a sudden, well, he's got to have something to say to the people that he's stolen the funds from. And so then there's another layer out there. That other layer has a finder. That's why Mr. Lesmay has got $75,000 from Mr. Giller Ducey for finding this transaction. And then Mr. Giller Ducey is, I mean, Mr. Sweet is able to send off money and then get a piece of paper that he has or he can point to, and everybody can go like this, the money's gone somewhere else and it's not my responsibility. Okay. But how do you – what is the evidence that a jury can conclude beyond a reasonable doubt that Giller Ducey had to know that based upon the fantastic scheme involved here, which is totally ridiculous, that Sweet inevitably is going to use the mail as part of the fraud? All right. Okay. Does he need to know that? I mean, one legal question is, does he need to know that? Does Giller Ducey need to know that? What does he need to know? What does he need to know? I would submit to you, Your Honor, that what he needs to know, first off, is this letter's only earthly purpose is to carry out a fraud. I mean, he knows Mr. Sweet. So we can assume that, of course. All right. So it has no honest purpose. It's not true. So it has no truth. He's done this 23 times before over a period of almost a year and a half. Mr. Giller Ducey already knows on November 25th, that's just before he carries out this transaction with Mr. Sweet, that's the day he signs those answers to interrogatories in the State of Illinois where the Illinois Attorney General is investigating him for fraud. So he knows that. How does he know that Sweet's using the mail as part of the fraud? That's because he's convicted of aiding and abetting mail fraud. He has to carry out, he has to lend aid in carrying out the fraud, and that's what he has to do. Oh, he's giving the letters. Substantial assistance. And he has furnished that. He doesn't have to know the details of who Sweet's dealing with. No, no. But he has to know that Sweet's going to use the mail as part of this. He doesn't have to know the details of how he's using it. I'm sorry, Your Honor? He doesn't have to know the details, but he has to know that Sweet is using the mail to obtain the money and to carry on and to keep the people quiet, giving them these ridiculous stories that he's giving them in the Christmas New Year's letter. I apologize if I'm mistaken, but I believe what he needs to do is participate in the fraud. And if the person he – there is an aiding and abetting account, of course, with each of them here, that the actual use of the mail, he doesn't have to be involved with that, and he doesn't even have to know about that. That's what creates the Federal crime in the jurisdiction, the use of the mails. But I do not believe that he actually has to know that. I would say also that he was communicating with Sweet by mail, and certainly the jury can infer that that's how Mr. Sweet's going to be communicating with his victims. But I don't believe, Your Honor, that he has to know that. All right. Why don't you go on to other issues? I'm sorry, Your Honor? Why don't you go on?  Are there other issues that you want to discuss? Okay. I haven't gone through all my – I felt the Court has been interested in the sufficiency of the evidence issue, and I did have several things that apparently were not exactly what you wanted. What about the instruction? We have a strange problem, which is that it was read wrong. Oh, yes. The misreading of the word, the judge just in the 45-minute or so reading of the jury instructions read the word defendant in the good faith instruction instead of the word victim. Three sets of written instructions went to the jury. They were all correct. They said victim. At trial, in rebuttal, I actually showed that instruction to the jury. So you actually put it up? I summarized it correctly. You didn't just read it from it. You actually showed it. On an Elmo in rebuttal argument. Okay. And also, we cited in the brief that I correctly summarized that it says victim. And we cited cases on that, that if there's – the cases of Held, including the Ninth Circuit, that if a judge misreads a word but the written instructions that go to the jury are correct, then that really is not an issue, and certainly not anything that would lead to a reversal given the plain error rule and all of that. Any further questions on that point? With respect to the tape recording that was discussed, the tape recording conversation with Mr. Ghilarducci, that was a cold call. I saw in the reply brief an indication where it was argued at page 2 of the reply brief by Mr. Ghilarducci that there was no evidence that Mr. Ghilarducci used intermediaries. There was very strong evidence, including at page 33 in the supplemental excerpts of record in the application for the confirmation of fund letter, talks about compensation to WFAs – that's Mr. Ghilarducci's company – as agents, brokers, employees, finders. They will be compensated. There was also testimony by Brian McGuire at trial on that point. And then there was a document at page 158 in the supplemental excerpts actually shows the payment of $75,000 to Les Mays. That is a finder. And our point on that – well, of course, there are points with respect to sufficiency of the evidence, but then with respect to the tape recording of the conversation is that the purpose of that finder, of course, is to screen Mr. Ghilarducci from two types of people, law enforcement agents who might be investigating him or honest investors who would screen bloody murder, be going to the police, hiring lawyers, and suing him if they actually somehow – get one of these letters from him. I think also, Your Honor, that would be cumulative, and the judge properly kept it out on four or three grounds as well as not being relevant because the agreement was in evidence, and that's where Mr. Ghilarducci did include all this language about the high-risk investment. But, you know, the thing on that is that can't be lost sight of is that on the one hand, you have that. All the things in the agreement, you know, about the high-risk investment and a sophisticated investor and all of that. You've also got two provisions there, one in the agreement, where the applicant agrees to assume the entire responsibility and liability to any third party claiming harm as a result of the transaction. And that's in the supplemental excerpts at page 65. And then in the escrow agreement at page 84, paragraph 13, there's language that says, if the depositor is someone other than the applicant, that person has no standing to challenge the transaction. Now, when you have this agreement, you get $450,000 of it for this one-page bogus letter. What are you talking about now, if I may? Are we still on the tape? Have you got off the tape now? I'm really kind of lost as to what we're arguing about. I will – What were you arguing about? I'm sorry? What were you arguing about? Again, I forgot to mention that with respect to the earlier questions about sufficiency of the evidence. And the point I wanted to make was that the whole sufficiency – I mean, you haven't been very helpful in the sufficiency question, because we all agree that there was a scam going on here. That isn't the question. The question is, what connects Mr. Ghilarducci to what he was found guilty of, which was mail fraud of particular letters and money laundering with regard to the fruits of mail fraud, which, again, ties back to the particular letters. That's our problem. Our problem isn't whether there was a massive – you didn't charge him, or at least the conspiracy account he was acquitted of. So we need to find out what connects him to this. Well, with respect to the money laundering, Your Honor, the only thing that needs to be shown there that it was over a certain amount, that was shown. And also that he knew that it was of criminally derived. And I believe these facts and circumstances most definitely do show that. And I also think the fact that it was criminally derived was shown by what the – by the – that Sweet was telling his investors lies. But if Sweet was sending letters to investors. Well, the way the – his first dealings, the application goes from Ghilarducci to Sweet on November 26th. The next thing that happens is $450,000 – I'm sorry. The next thing that happens is the agreement is entered into on December 2nd, like about six days later, for delivery of the COF letter. The next day, all this money comes in on December 3rd. And on December 5th, the COF letter goes out. The only financial information coming from Mr. Sweet is the same day that the COF letter goes out. And two days after the $450,000 come in, that's on December 5th at page 78 in these excerpts. And there's no financial information furnished by Mr. Sweet at all. And then the documents, it talks about high degree of risk, but at the same time, if it turns out to be somebody else's money. The charge is such property having been derived from a specific unlawful activity, that is mail fraud. So what was the mail fraud from which the property was derived? Thank you very much, Your Honor. And again, Your Honor, I certainly apologize if I'm wrong in this. But I'm as close to crystal-clearly certain as I can be that we do not have to show and did not have to show what crime the money was derived from. And I believe that's the way the jury instruction reads. It just has to be criminally derived. Yeah. It doesn't matter what crime. The specific language refers to it has to turn out to have been a crime that is mentioned somewhere in those statutes. And that it is. Now, how does Gil Adichie know that the funds were derived by Sweet giving his investors this ridiculous story? Again, he just has to know it's criminally derived. I submit to you, Your Honor, that nobody is going to pay $450,000 of their own money for one page of absolutely worthless nonsense telling the person, the receiver of the letter, that you have $10 million in some bank down in Costa Rica when, in fact, your house is in bankruptcy, you're in foreclosure. You know the letter is worthless. Mr. Gil Adichie, providing it, knows it's worthless and phony and, therefore, knows that obviously along the lines of what Mr. Kerr explained about the layers of these frauds, this is an applicant. He's been found by his finder, and this is somebody who's gathering money illegally, taking it from other people, and that's the source of the money. And in the language in the agreements about good, clean, cleared funds of non-criminal origin, I mean, that is ridiculous. But beyond ridiculous, the expert testified, that's what you see in these fraudulous and fictitious instruments. Totally phony. Okay. Thank you very much. Thank you. I don't know if there's any time left. Is there any time left? I'm sorry? You're over three minutes. I think that we have exhausted our ability to listen at this point, so thank you very much.  All rise. This court for discussion stands adjourned. Thank you. Thank you. I'll see you here at the second voting wall. Yes. Thank you very much. All rise. Thank you very much. Great. Have a good day. Thank you. Thank you so much. Thank you all very much. Do you see that? Yes. Thank you. Thank you.
judges: D.W. Nelson, Cowen , Berzon